FILED
TD
3/25/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (Rev. 11/11) Criminal Complaint · · · · · · · · · · · · · · · · · · AUSA Adam L. Rosenbloom (312) 353-0962

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NUMBER: 26 CR 125 |
| v. | Ref. No. 26 GJ 171 |
| JAIME CASTILLO-MEDINA | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about February 24, 2026, at Gurnee, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Did knowingly and intentionally distribute a controlled substance, namely 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance. |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

Erin Pfeiffer by MV

ERIN PFEIFFER
Special Agent, Homeland Security Investigations (HSI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: March 25, 2026

*Judge's signature*

City and state: Chicago, Illinois

MARIA VALDEZ, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, ERIN PFEIFFER, being duly sworn, state as follows:

1. I am a Special Agent with the Homeland Security Investigations (HSI), and have been so employed for approximately two years. My current responsibilities include the investigation of narcotics trafficking offenses.

2. This affidavit is submitted in support of a criminal complaint alleging that on or about February 24, 2026, Jaime CASTILLO-MEDINA, did knowingly and intentionally distribute a controlled substance, namely 500 grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging CASTILLO-MEDINA with distributing 500 grams or more of cocaine, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. As part of my duties as Homeland Security Investigations Special Agent, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and

Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

4.      I have received training in the area of narcotics investigations, money laundering, financial investigations and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

5.      The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts.

## I.      FACTS SUPPORTING PROBABLE CAUSE

### A.      SUMMARY OF PROBABLE CAUSE

6.      Since approximately November 2025, law enforcement, including HSI and Lake County Sheriff's Office ("LCSO"), has been investigating Jaime CASTILLO-MEDINA, a suspected narcotics trafficker in Lake County, Illinois. In summary and as described in additional detail below, law enforcement officers have purchased cocaine from CASTILLO-MEDINA on approximately four occasions between December 2025 and February 2026, including approximately 1,000.28 grams of cocaine on or about February 24, 2026.

2

**B.      CASTILLO-MEDINA DISTRIBUTED NARCOTICS TO CS-1 IN NOVEMBER 2025**

7.      In approximately November 2025, law enforcement received information from a confidential source (CS-1[1]) that a person CS-1 knew as "Jamie" was selling cocaine in the Chicagoland area. CS-1 told law enforcement officers that "Jamie's" Facebook name was "Jamie Medina."

8.      Based on CS-1's information, law enforcement identified "Jamie" as potentially CASTILLO-MEDINA. Law enforcement obtained a driver's license photograph of CASTILO-MEDINA from an Illinois Secretary of State driver's license database and showed it to CS-1. CS-1 identified the person in the photo of CASTILLO-MEDINA as the person CS-1 referenced as "Jamie."

9.      In November 2025, at the request of law enforcement, CS-1 contacted CASTILLO-MEDINA by phone in an attempt to purchase narcotics and introduce an undercover law enforcement officer to CASTILLO-MEDINA. The calls were not recorded. In summary, according to CS-1, CASTILLO-MEDINA agreed to meet CS-1 at a car dealership on the 1600 block of Park Avenue in Highland Park, Illinois ("Car Dealership A") for the purpose of conducting a narcotics transaction.

---

[1] Between approximately May 2024 and November 2025, law enforcement observed CS-1 engaging in potential narcotics violations. When approached by law enforcement, CS-1 agreed to cooperate in order to avoid being charged with any offenses. Since that time, CS-1 has provided law enforcement credible information that has been corroborated through recordings, social media information, and surveillance, some of which is described in this affidavit. Since cooperating with law enforcement, on several occasions, CS-1 provided information which led to the successful seizure of controlled substances. In or about November 2025, law enforcement informed CS-1 that law enforcement would not propose charges to prosecuting authorities arising from the potential narcotics violations previously observed if CS-1 provided information that led to one more similar seizure. To date CS-1 has not been paid by law enforcement. CS-1 has been charged three times for drug offenses and has been convicted twice; CS-1 has been charged  five times for weapons offenses and has been convicted once. CS-1 is a United States Citizen.

10.     On the day of the transaction, CS-1 met with law enforcement at a predetermined location. Law enforcement officers searched CS-1 for money and illegal substances, with negative results. Law enforcement provided CS-1 with $700 and outfitted CS-1 with an audio recording device. An undercover law enforcement officer ("UC-1") drove CS-1 in an undercover vehicle ("UCV"), while under constant surveillance of law enforcement, to the transaction location near Highland Park.

11.     Law enforcement officers also conducted surveillance at Car Dealership A. Law enforcement officers conducting surveillance observed a person identified as CASTILLO-MEDINA, based on a comparison with CASTILLO-MEDINA's driver's license photograph, exit Car Dealership A and enter Subject Vehicle 1.[2] He appeared to retrieve an item from inside the driver's compartment of Subject Vehicle 1. CASTILLO-MEDINA then exited Subject Vehicle 1 and met with CS-1 outside of Subject Vehicle 1. There did not appear to be anyone else in or near Subject Vehicle 1.

12.     According to CS-1, in summary and in part:

a.      CASTILLO-MEDINA handed CS-1 a knotted plastic baggie that contained a white powdery substance.

---

[2] Subject Vehicle 1 is a silver Toyota Camry, bearing IL registration EY71933, VIN 4T4BE46K99R09260.  It registered to CASTILLO-MEDINA, at an address on the 18000 block of W Main Street, Grayslake, Illinois. On February 9, 2026, Judge Maria Valdez signed a warrant that authorized law enforcement to place a tracking device on Subject Vehicle 1. *See* 26 M 81 (Under Seal).

4

   b.  During the transaction, CS-1 told CASTILLO-MEDINA that the person driving the UCV (UC-1) was a kilogram level buyer and was interested in doing "business"[3] with CASTILLO-MEDINA.

   c.  CASTILLO-MEDINA told CS-1 that he wanted to get to know UC-1 more before working with UC-1 directly.

13. CS-1 returned to the UCV and handed the knotted plastic baggie to UC-1. CS-1 told law enforcement that he/she received the substance from an individual he/she knew as "Jamie." CS-1 also told UC-1 that CASTILLO-MEDINA's phone number was 847-***-7592 (the "7592 Phone").

14. UC-1 and CS-1 departed the meeting location while under law enforcement-maintained surveillance. A field test on the white powdery substance indicated positive results for the presence of cocaine and that the sample and packaging weighed approximately 29.0 grams.

---

[3] The investigation included the use of consensually reviewed text messages, recorded telephone calls, and audio/video recorded meetings. Most of the recorded conversations are in the Spanish language, and the quoted portions are based on preliminary, not final, translations. The summaries of the recorded conversations are based on communications by CS-1, UC-1, and UC-2 to law enforcement as well as the recorded meetings. The language that is quoted from the recorded conversations throughout this affidavit is based upon a preliminary review, not final transcripts, translations, or interpretations, of the recorded conversations. The times listed for the recorded conversations are approximate. The summaries do not include all potentially criminal communications or topics covered during the course of the recorded conversations.

At various points in the affidavit, I have also included in brackets or otherwise my understanding of what is being said during such recorded conversations. My understanding and interpretations of the recorded conversations are based on (i) the contents and context of the recorded conversations, (ii) my experience and my fellow agents' experiences as law enforcement agents, (iii) my knowledge of the investigation as a whole, and (iv) information provided by CS-1, UC-1, and UC-2.

### C.   CASTILLO-MEDINA DISTRIBUTED NARCOTICS TO UC-1 ON DECEMBER 29, 2025

15.   On December 23, 2025, UC-1 sent a text message to the 7592 Phone in an attempt to facilitate an additional narcotics transaction. There was initially some confusion about the identity of the UC-1, and CASTILLO-MEDINA called UC-1. An unrecorded conversation between UC-1 and CASTILLO-MEDINA took place. According to UC-1, during the conversation, CASTILLO-MEDINA agreed to sell UC-1 one ounce of cocaine for $900.

16.   According to UC-1, on December 28, 2025, CASTILLO-MEDINA called UC-1 from (847) ***-1772 (Subject Phone 1)[4] and confirmed the deal for the following day. The call was not recorded.

17.   According to UC-1, on December 29, 2025, CASTILLO-MEDINA called UC-1 from 224-***-3668 (Subject Phone 2)[5] and told UC-1 to use that phone number for further communication. CASTILLO-MEDINA also set the meet location at Car Dealership A. The call was not recorded. CASTILLO-MEDINA told UC-1 that he was employed at Car Dealership A.[6]

---

[4] On or about February 17, 2026, Judge Laura K. McNally signed a search warrant authorizing law enforcement to obtain historical and prospective cell site information for Subject Phone 1. *See* 26 M 92 (Under Seal).

[5] On or about March 5, 2026, Judge Keri L. Holleb Hotaling signed a search warrant authorizing law enforcement to obtain historical and prospective cell site information for Subject Phone 2. *See* 26 M 123 (Under Seal).

[6] According to a representative of Car Dealership A, CASTILLO-MEDINA worked at Car Dealership A between at least December 2025 and the time that CASTILLO-MEDINA's employment was terminated on or about February 16, 2026.

18.     UC-1 was given $900 and was outfitted with an audio and video recording device. UC-1, while under constant surveillance of law enforcement, drove to Car Dealership A in a UCV.

19.     Law enforcement also established surveillance at Car Dealership A. Law enforcement officers conducting surveillance observed Subject Vehicle 1 arrive and park next to a gold Honda sedan bearing Illinois registration N838504.[7] A person that law enforcement identified as CASTILLO-MEDINA based on his appearance exited Subject Vehicle 1 and entered the front driver compartment of the gold Honda. Shortly thereafter, CASTILLO-MEDINA exited the gold Honda and entered the front driver seat of Subject Vehicle 1. The gold Honda appeared to have no other occupants.

20.     Law enforcement officers conducting surveillance then observed CASTILLO-MEDINA drive to where the UCV was parked and parked next to it. CASTILLO-MEDINA exited Subject Vehicle 1 and entered the front passenger seat of the UCV.

21.     According to UC-1, in summary and in part:

a.      CASTILLO-MEDINA handed UC-1 a white substance in a clear plastic bag. UC-1 then handed CASTILLO-MEDINA $900.

b.      CASTILLO-MEDINA then exited the UCV and entered the driver's compartment of Subject Vehicle 1 and drove away from the location.

---

[7] Illinois Secretary of State records show the gold Honda is registered to  CASTILLIO-MEDINA on the 18000 block of West Main Street in Grayslake, Illinois, VIN JHMCM56323C037858.

22.     According to law enforcement officers conducting surveillance, CASTILLO-MEDINA then departed the area.

23.     The white powdery substance was sent to the Northeastern Illinois Regional Crime Laboratory for testing. According to the laboratory, the substance contained cocaine and had a total net weight of approximately 28.28 grams.

### D.     CASTILLO-MEDINA DISTRIBUTED NARCOTICS TO UC-1 ON JANUARY 12, 2026

24.     In early January 2026, UC-1 at the direction of law enforcement, again purchased cocaine from CASTILLO-MEDINA in the Waukegan, Illinois area. This transaction was video and audio recorded.

25.     On January 8, 2026, UC-1 and CASTILLO-MEDINA, using a WhatsApp account associated with Subject Phone 1, exchanged several messages.[8] These messages were preserved. In summary and in part:

a.     UC-1 asked CASTILLO-MEDINA, "how much for half and for full?" CASTILLO-MEDINA responded, "Half kilogram 10. Full kilogram 18500. 2 kilograms for 17500 each." Based on my training and experience and familiarity with this investigation, I believe that CASTILLO-MEDINA was saying that he could sell UC-1 a half kilogram of cocaine for $10,000; a full kilogram of cocaine for $18,500; and two kilograms of cocaine for $17,500 per kilogram.

---

[8] Law enforcement officers determined that this WhatsApp account was associated with Subject Phone 1 based on the following facts: The WhatsApp account with which UC-1 communicated on January 8, 2026, showed the number of Subject Phone 1. On January 13, 2026, UC-1 received a voice call via the WhatsApp account associated with Subject Phone 1. UC-1 recognized the voice of CASTILLO-MEDINA from December 29, 2025, encounter and previous phone calls with CASTILLO-MEDINA.

b.      UC-1 and CASTILLO-MEDINA also discussed purchasing an additional ounce of cocaine. UC-1 told CASTILLO-MEDINA that he had a contact who "want[ed] to try it" and asked for "another one like the other day." CASTILLO-MEDINA responded that "There is one even better than the other one." UC-1 proposed a price of $800, and CASTILLO-MEDINA agreed." Based on my training and experience and familiarity with this investigation, I believe that CASTILLO-MEDINA was discussing his ability to provide a sample of cocaine that was of higher quality than the narcotics he previously provided to CS-1.

26.      CASTILLO-MEDINA and UC-1 agreed to meet on January 12, 2026, at a McDonald's on Belvidere Road near Waukegan, Illinois, to conduct the transaction. Based on an open-source search, I know that there is a McDonald's on the 3200 block of Belvidere Road in Park City, Illinois, which is near Waukegan.

27.      On January 12, 2026, UC-1 and CASTILLO-MEDINA, using a WhatsApp account associated with Subject Phone 1, exchanged several messages. These messages were preserved. In summary and in part, UC-1 and CASTILLO-MEDINA confirmed the meeting time and location for that day.

28.      Prior to conducting the transaction, UC-1 met with law enforcement at a pre-determined location. UC-1 was provided with $800 cash. UC-1 was outfitted with audio and video recording devices. UC-1 drove a UCV to the transaction location.

29.      Law enforcement also established surveillance at the transaction location. Law enforcement officers conducting mobile surveillance observed Subject

Vehicle 1 park in the parking lot prior to UC-1's arrival. UC-1 then parked near Subject Vehicle 1. Law enforcement officers observed an individual who appeared to be CASTILLO-MEDINA exit the driver's seat of Subject Vehicle 1 and get into the passenger seat of the UCV.

30.    According to UC-1, in summary and in part:

a.    Once inside the UCV, CASTILLO-MEDINA handed a white substance in a clear plastic bag to UC-1. CASTILLO-MEDINA in exchange took $800 from UC-1.

b.    UC-1 and CASTILLO-MEDINA talked about the fact that this narcotics transaction was a sample and that CASTILLO-MEDINA could provide at least three kilograms of cocaine at a time if needed. CASTILLO-MEDINA also said he would offer a reduced rate for greater volumes of narcotics.

c.    CASTILLO-MEDINA then exited the UCV, entered the driver's seat of Subject Vehicle 1, and departed the area.

31.    UC-1 departed the meeting location while law enforcement-maintained surveillance. Law enforcement submitted the white powdery substance that CASTILLO-MEDINA sold to UC-1 to the Northeastern Illinois Regional Crime Laboratory for testing. According to the lab, the substance contained cocaine and had a total net weight of 27.66 grams.

**E.    CASTILLO-MEDINA DISTRIBUTED NARCOTICS TO UC-1 ON JANUARY 28, 2026**

32.    In late January 2026, UC-1, at the direction of law enforcement, again purchased cocaine from CASTILLO-MEDINA in the Waukegan, Illinois area.

33. On January 25, 2026, UC-1 and CASTILLO-MEDINA, using a WhatsApp account associated with Subject Phone 1, exchanged messages. These messages were preserved. According to those recorded messages, during the communications, in summary and in part:

a. UC-1 and CASTILLO-MEDINA discussed timing for another transaction, ultimately settling on the following Wednesday.

b. CASTILLO-MEDINA sent an image with the same price descriptions described above.

c. CASTILLO-MEDINA told UC-1 to decide on a quantity "so I can tell my friend and how many barrels of oil." Based on my training and experience and the context of the investigation, I believe "barrels of oil" was a reference to kilograms of cocaine.

d. UC-1 told CASTILLO-MEDINA that he wanted a half. In response to a request for a price break, CASTILLO-MEDINA offered "extra oil" to allow UC-1 to make some money on the transaction. Based on my training and experience and the context of the investigation, I believe "extra oil" was a reference to additional cocaine beyond the agreed quantity that CASTILLO-MEDINA was providing to UC-1.

e. UC-1 told CASTILLO-MEDINA to "make sure the oil is clean." CASTILLO-MEDINA responded, "You know that it is quality." Based on my training and experience and the context of the investigation, I believe CASTILLO-MEDINA was referring to the quality of the cocaine.

34.     On January 28, 2026, UC-1 and CASTILLO-MEDINA, a WhatsApp account associated with Subject Phone 1, exchanged messages. These messages were preserved. In summary and in part, UC-1 and CASTILLO-MEDINA confirmed the meeting time and location for that day.

35.     According to gate surveillance video from Storage Facility A, which is located on the 3500 block of Washington Street in Gurnee, Illinois, at approximately 7:30 a.m. on January 28, 2026, a silver Toyota Camry entered the gate using the access code associated with Unit 135D. The silver Camry exited the facility at approximately 7:51 a.m.

36.     UC-1 met with law enforcement at a pre-determined location. UC-1 was outfitted with audio and video recording devices. UC-1 drove a UCV to the McDonald's in Park City, Illinois. A second undercover law enforcement officer, UC-2, was provided $10,000 for purposes of conducting the transaction. UC-1 and UC-2 traveled to the transaction location separately for officer safety.

37.     Law enforcement established surveillance at the transaction location. UC-1 parked the UCV and waited for CASTILLO-MEDINA to arrive. CASTILLO-MEDINA called UC-1 two times via WhatsApp from Subject Phone 1. These calls were recorded. According to UC-1, in summary and in part:

a.      CASTILLO-MEDINA told UC-1 that he was running behind schedule because his scale wasn't working and he needed to purchase a new one.

b.      CASTILLO-MEDINA went on to say that he had to weigh "it" because it had been in the cold. Based on my training and experience and the

12

context of the investigation, I believe CASTILLO-MEDINA was referring to cocaine that had been stored in a cold location.

38. According to a representative of Storage Facility A, Unit 135D at Storage Facility A is not heated.

39. Law enforcement officers conducting mobile surveillance observed Subject Vehicle 1 arrive at the transaction location at approximately 8:11 a.m. and park near the UCV. CASTILLO-MEDINA exited the driver's seat of Subject Vehicle 1 and entered the passenger seat of the UCV. CASTILLO-MEDINA appeared to be the sole occupant Subject Vehicle 1. CASTILLO-MEDINA carried a clear plastic bag that appeared to contain an object.

40. According to UC-1, in summary and in part:

a. CASTILLO-MEDINA entered the passenger seat of the UCV with a brand-new digital scale inside a plastic bag in his possession. CASTILLO-MEDINA then removed a dark colored bag from inside his jacket and retrieved a plastic bag from the dark colored bag. The plastic bag appeared to contain a white rock/brick like substance.

b. CASTILLO-MEDINA placed the plastic bag on the scale on the passenger floorboard, and UC-1 observed that it weighed approximately 540 grams.

c. CASTILLO-MEDINA then proceeded to remove a portion of the white rock/brick like substance from the plastic bag and scale. UC-1 observed that the scale then displayed 506 grams.

13

d.      CASTILLO-MEDINA handed the plastic bag with 506 grams to the UC-1 and stated there was a "little extra."

e.      After UC-1 observed the white powder substance, he/she contacted UC-2 to bring the money. UC-2 arrived and entered the backseat of the UCV. UC-2 gave CASTILLO-MEDINA $10,000 in a brown paper bag.

f.      CASTILLO-MEDINA counted the money and then exited the UCV.  CASTILLO-MEDINA then entered the driver seat of Subject Vehicle 1 and departed the area.

41.     UC-1 and UC-2 departed the meeting location while law enforcement-maintained surveillance on CASTILLO-MEDINA. Law enforcement officers observed Subject Vehicle 1 proceed directly to a residence on the 1400 block of Magnolia Avenue in Gurnee, Illinois (the "Subject Residence"), without making any intermediate stops.

42.     The substance that CASTILLO-MEDINA distributed to UC-1 was submitted to the United States Customs and Border Protection for testing and analysis. According to the laboratory report, the substance had a net weight of approximately 497.31 grams and contained cocaine.

**F.      CASTILLO-MEDINA DISTRIBUTED APPROXIMATELY ONE KILOGRAM OF COCAINE TO UC-1 ON FEBRUARY 24, 2026**

43.     In late February 2026, UC-1, at the direction of law enforcement, purchased cocaine from CASTILLO-MEDINA in the Waukegan, Illinois area.

44.     In particular, on February 23, 2026, UC-1 and CASTILLO-MEDINA, using a WhatsApp account associated with Subject Phone 1, exchanged messages.

14

These messages were preserved. According to those recorded messages, during the communications, in summary and in part:

a. UC-1 and CASTILLO-MEDINA discussed timing for another transaction, ultimately settling on the following day, Tuesday.

b. UC-1 told CASTILLO-MEDINA, "One whole, 18,500 [one kilogram of narcotics for $18,500]. Right?", CASTILLO-MEDINA responded "Ok, I'll confirm in an hour."

c. CASTILLO-MEDINA told UC-1 "Ready, Tomorrow", UC-1 responded "Ok. At 8? Is that ok?", CASTILLO-MEDINA replied "Ready."

45. On February 24, 2026, UC-1 and CASTILLO-MEDINA, using a WhatsApp account associated with Subject Phone 1, exchanged messages. These messages were preserved. According to those recorded messages, during the communications, in summary and in part:

a. UC-1 told CASTILLO-MEDINA "I'll send you a message when I get there at 8."

b. CASTILLO-MEDINA responded "Ready."

46. UC-1 met with law enforcement at a pre-determined location. UC-1 was outfitted with audio and video recording devices. UC-1 drove a UCV to McDonalds in Park City, Illinois. A second undercover law enforcement officer, UC-2, was provided $18,500 for purposes of conducting the transaction. UC-1 and UC-2 traveled to the transaction location separately for officer safety.

47. Law enforcement established surveillance at the transaction location. UC-1 parked the UCV and waited for CASTILLO-MEDINA to arrive. UC-1 called CASTILLO-MEDINA on Subject Phone 1 and let him know they were at McDonald's, CASTILLO-MEDINA explained that he would be calling them from a new number and to use that number to communicate.

48. CASTILLO-MEDINA called UC-1 from Subject Phone 2. According to UC-1 in summary and in part:

a. CASTILLO-MEDINA told UC-1 that he wanted to change the deal location another business in Waukegan due to McDonald's having a lot of video surveillance.

b. UC-1 told CASTILLO-MEDINA that he would not switch locations due to his "money man" (UC-2) not being comfortable with the change in locations. CASTILLO-MEDINA agreed to meet at McDonald's.

49. At approximately the same time, law enforcement officers were conducting ground and aerial surveillance of the Subject Residence. Video of the aerial surveillance was preserved. Law enforcement officers conducting surveillance observed the following, in summary and in part:

a. An individual subsequently identified as CASTILLO-MEDINA[9] exited the rear of the Subject Residence. He walked toward a vehicle parked in the driveway, which was subsequently identified as Subject Vehicle 1 by officers

---

[9] Law enforcement officers identified this individual as CASTILLO-MEDINA based on his general appearance, clothing, subsequent surveillance, and the narcotics transaction with UC-1 and UC-2 that followed this initial surveillance.

conducting ground surveillance based on its appearance and license plate. CASTILLO-MEDINA opened the trunk and appeared to be doing something inside the trunk for approximately 30 seconds. The aerial surveillance at this point was partially obstructed based on aircraft's location.

b.  CASTILLO-MEDINA then walked to a silver vehicle parked in the driveway in front of Subject Vehicle 1 and entered the front passenger compartment for approximately 35 seconds.

c.  CASTILLO-MEDINA then walked into the rear entrance of the Subject Residence. Approximately three minutes later, CASTILLO-MEDINA exited the same door he entered and walked directly to a black pickup truck ("Subject Vehicle 2"),[10] and entered the front driver's seat. No other occupants were identified entering or exiting Subject Vehicle 2.

d.  Subject Vehicle 2 drove to Storage Facility A. Law enforcement officers conducting surveillance observed that the storage facility consists of garage-style units that open to the facility's driveways. The door to each unit and the unit number are visible from the facility's driveways.

e.  Law enforcement officers conducting aerial surveillance observed Subject Vehicle 2 drive through the gate of the storage facility. Subject Vehicle 2 drove past three rows of storage units and turned northbound down the

---

[10] Law enforcement officers conducting surveillance later observed that Subject Vehicle 2 was a black Dodge pickup truck with Illinois license plate 4296347B. Illinois Secretary of State records show the black Dodge pick-up truck is registered to CASTILLIO-MEDINA and Individual A on the 18000 block of West Main Street in Grayslake, Illinois, VIN 1C6RR7KGXDS717460.

last row of units. Subject Vehicle 2 stopped at the ninth from last door on the left side of the last row.

f.     According to a map of the facility provided by Storage Facility A, the storage unit building CASTILLO-MEDINA accessed was Building D.

g.     Law enforcement officers observed CASTILLO-MEDINA unlock and open the door to unit 135D.[11] CASTILLO-MEDINA walked inside Unit 135D for approximately 2 minutes before closing and locking the door. Law enforcement officers conducting aerial surveillance observed that CASTILLO-MEDINA carried something from the storage unit to the rear driver side door of Subject Vehicle 2.

h.     Subject Vehicle 2 then exited Storage Facility A and drove to McDonald's in Park City, Illinois, without making any intermediate stops.

50.     According to gate surveillance video from Storage Facility A, at approximately 8:02 a.m. on February 24, 2026, a black Dodge Ram pickup truck entered the gate using the access code associated with Unit 135D. The black Dodge Ram exited the facility at approximately 8:05 a.m.

51.     Law enforcement officers conducting air and mobile surveillance observed Subject Vehicle 2 arrive at the McDonald's in Park City and park near the UCV. Law enforcement officers observed that CASTILLO-MEDINA was reaching for something near the rear driver side door of Subject Vehicle 2. CASTILLO-MEDINA appeared to be the sole occupant Subject Vehicle 2.

---

[11] According to Storage Facility A, 135D is a 10x20 cube rented by Individual B under account number  ending 4613.

52. Law enforcement officers conducting air and mobile surveillance observed CASTILLO-MEDINA exit the driver's seat of Subject Vehicle 2 and enter the passenger seat of the UCV.

53. According to UC-1, after CASTILLO-MEDINA entered the UCV, UC-1 placed a call to UC-2 to bring $18,500. UC-2 drove from a nearby location to the McDonald's parking lot. When UC-2 arrived approximately two minutes later, UC-1 exited UCV and walked to UC-2's UCV to retrieve the money. UC-2 then returned to the UCV.

54. According to UC-1, CASTILLO-MEDINA gave UC-1 a rectangular, wrapped, green, brick shaped object with the markings "YAMAHA" written on it in exchange for $18,500. In addition, CASTILLO-MEDINA gave UC-1 a clear plastic knotted baggie containing a white powdery substance and said it was "for [UC-1]."

55. According to UC-1:

a. UC-1 had a conversation with CASTILLO-MEDINA inside the UCV, which conversation was recorded and preserved.

b. During the conversation, in summary and in part, UC-1 asked if the cocaine was "stepped on," and CASTILLO-MEDINA responded by saying that it is "pure." Based on my training and experience and familiarity with this investigation, I believe that CASTILLO-MEDINA was discussing the quality of cocaine.

56. UC-1 and UC-2 departed the meeting location while law enforcement-maintained surveillance.

57. A field test on the white powdery substance inside the brick shaped object that CASTILLO-MEDINA distributed to UC-1 indicated positive results for the presence of cocaine. This substance was submitted to the United States Custom and Border Protection for testing and analysis, which confirmed the presence of cocaine. According to the laboratory report, the net weight of the substance was approximately 1000.28 grams.

## G.   CONCLUSION

58.   Based on the above, I respectfully submit that there is probable cause to believe that on or about February 24, 2026, JAIME CASTILLO-MEDINA did knowingly and intentionally distribute a controlled substance, namely 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

Erin Pfeiffer by MV

ERIN PFEIFFER
Special   Agent,   Homeland   Security
Investigations

SWORN TO AND AFFIRMED by telephone March 25, 2026.

Honorable MARIA VALDEZ
United States Magistrate Judge

21